UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HENG REN INVESTMENTS LP,<br><br>Plaintiff,<br><br>v.<br><br>SINOVAC BIOTECH LTD. AND WEIDONG YIN,<br><br>Defendants | Leave to file granted April 29, 2021<br><br>Civil Action No. 1:19-cv-11612-NMG<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Plaintiff Heng Ren Investments LP ("Plaintiff'), by and through its undersigned attorneys, as and for their First Amended Complaint against Sinovac Biotech Ltd. ("Sinovac" or the "Company") and Weidong Yin ("Yin"), alleges as follows.

## NATURE OF ACTION

1. Plaintiff, a Massachusetts limited partnership based in Boston, brings this direct action as a minority stockholder of Sinovac against the Company and Yin, its *de facto* controlling shareholder, Chairman, President and Chief Executive Officer ("CEO"). Plaintiff seeks to recover damages based upon the wrongful dilution of its shares as a result of a self-dealing, Public Investment in Private Equity transaction (the "Dilutive PIPE Transaction"), through which Yin is attempting to cement his control of the Company by selling 11,800,000 shares at a fire sale price to his friends and affiliates. Defendants breached their fiduciary duties to minority shareholders of the Company by entering into the Dilutive PIPE Transaction. In addition, several unusual transactions in Sinovac and its subsidiary which have occurred subsequent to the PIPE Transaction suggest that Yin's efforts at depriving minority shareholders the true value of their investments continues – even while this litigation is in progress.

2. Sinovac is one of the leading biopharmaceutical companies in the People's Republic of China ("China"). Sinovac engages in the research, development, manufacture and commercialization of vaccines, including a vaccine for the COVID19 virus. The Company's securities are listed on the Nasdaq Stock Market but have not traded since 2019 due to a halt on trading resulting from other related litigation challenging the legality of the dilutive PIPE transaction.

3. Since 2016, Yin and a group of allied investors have tried to take complete control of Sinovac on the cheap, first through a going private transaction ("Going Private Transaction"). These efforts failed after rival bidders placed superior bids. Yin improperly rejected these superior bids.

4. Further, in an improper attempt to prevent Sinovac's large shareholders from offering competing bids, Yin caused Sinovac's board to adopt a "poison pill" provision providing that, if stockholders holding at least 15% of Sinovac stock enter into an agreement to act together for purposes of voting their shares, Sinovac could massively dilute all stockholders.

5. On July 3, 2018, Yin consummated the Dilutive PIPE Transaction by causing Sinovac to issue Company stock in a private transaction to two members of his buyer group (Vivo Capital, LLC and Advantech Partners LP) at well below market value. As part of their scheme, Yin and Sinovac deliberately underplayed the fact that Sinovac had achieved a breakthrough in developing a revolutionary new polio vaccine. Yin deliberately concealed material facts in order to artificially suppress Sinovac's stock price at the time of the Dilutive PIPE Transaction, so that he and his control group could buy the Company at a price that is dramatically below its fair value.

6. The Dilutive PIPE Transaction is an improper transfer of economic value and voting power from public shareholders (including Plaintiff) to controlling stockholders led by Yin.

Plaintiff seeks damages based upon the value of shares that were wrongfully diluted through Defendants' misconduct.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Defendant pursuant to G.L. c. 223A §3(a), by virtue of the fact that Sinovac transacted business in the Commonwealth and this action pertains to such transactions, and by virtue of the fact that Defendants caused tortious injury in this Commonwealth by an act or omission outside of the Commonwealth, where they engaged in a persistent course of conduct in the Commonwealth, consenting to the jurisdiction of the Commonwealth by choosing to file a lawsuit (the "Sinovac Massachusetts Lawsuit") in the United States District Court for the District of Massachusetts asserting purported claims against Sinovac shareholders. *See Sinovac Biotech Ltd. v. 1Globe Capital LLC et. al.*, No. 15-10421 (NMG) (D. Mass.). The Sinovac Massachusetts Lawsuit involves many of the transactions that are at issue in this lawsuit, including the Dilutive PIPE Transaction.

8. The Court has jurisdiction over Yin because, he caused Sinovac to file the Sinovac Massachusetts Lawsuit (which seeks, *inter alia*, declaratory relief involving transactions relating to Yin).

9. In addition, the Court has jurisdiction over Sinovac and Yin because the Company promoted investing in the Company within Commonwealth of Massachusetts. The Company's representatives have met in Boston, Massachusetts with the Plaintiff's managing partner to discuss, among other things, Sinovac's pipeline of vaccines under development.

10. Venue is proper in this court because the Sinovac Massachusetts Lawsuit was filed in this District.

## PARTIES

11. Plaintiff Heng Ren Investments LP is a limited partnership incorporated under the laws of the Commonwealth of Massachusetts, with its principal place of business in Boston, Massachusetts. Plaintiff is currently and has all relevant time been a shareholder of Sinovac.

12. Defendant Sinovac is incorporated in Antigua, West Indies and its principal offices are located in Beijing, China.

13. Defendant Yin has been the Company's Chairman, President, and CEO at all relevant times.

## RELEVANT NON-PARTIES

14. SAIF Partners IV L.P. ("SAIF") is a private equity fund which invests in companies based in or having a principal place of business in the Asia-Pacific region. On January 30, 2016, Yin and SAIF Partners IV L.P. (the "Yin Group") jointly submitted a bid to acquire all shares of Sinovac in a purported "going private" transaction.

15. Advantech Capital Partners Ltd. ("Advantech Capital") is a private equity fund focused on innovation-driven growth in China. Advantech Capital provided financing for Yin's efforts at taking Sinovac private and purchased Sinovac stock in the Dilutive PIPE Transaction.

16. Vivo Capital, LLC ("Vivo Capital") is a healthcare-focused investment firm formed in 1996 that is currently making investments from its $1.4 billion Vivo Capital Fund IX into promising private healthcare companies. Vivo Capital provided financing for Yin's efforts at taking Sinovac private and purchased Sinovac stock in the Dilutive PIPE Transaction.

17. Sinobioway Group Co., Ltd. ("Sinobioway") is a publicly traded Chinese company affiliated with Peking University. In February 2016, a consortium led by Sinobioway submitted a bid to acquire all shares of Sinovac.

## FACTUAL ALLEGATIONS

**Sinovac's Explosive Growth**

18.     Sinovac is a China-based biopharmaceutical company that is engaged in the development, manufacture and commercialization of vaccines for a wide variety of diseases. Over the past two decades, Sinovac has established an impressive track record of developing and commercializing world-class vaccines.

19.     In 2002, Sinovac launched its first product, Healive – the first inactive hepatitis A vaccine developed, produced and marketed by a China-based manufacturer. In 2005, Sinovac received regulatory approval for the production of Bilive in China, a hepatitis vaccine, and Anflu, an influenza vaccine. In April 2008, Sinovac received regulatory approval for the production in China of an avian flu vaccine, approved for sale to the Chinese national vaccine stockpiling program.

20.     In September 2009, Sinovac was granted a license for Panflu 1, the first approved vaccine in the world against the influenza A H1N1 virus (swine flu). In December 2011, Sinovac obtained a license from Chinese regulators for its mumps vaccine and launched the vaccine in late 2012. In December 2015, Chinese regulators approved a license for Inlive, a vaccine for foot and mouth disease, which Sinovac launched in China in June 2016.

21.     Sinovac has a robust pipeline of new vaccines. Indeed, Sinovac has filed new drug applications for PPV, varicella vaccine, sIPV, and quadrivalent influenza vaccine in June 2017, November 2017, December 2018 and February 2019, respectively.

22.     Due to its extraordinary success in developing and commercializing vaccines, Sinovac has achieved explosive growth in revenues and profits. In 2016, Sinovac's annual revenues were $72 million. In 2017 and 2018, Sinovac's annual revenues skyrocketed to $174 million and $230 million, respectively.

23. In 2016, Sinovac's gross profit was $50 million. In 2017 and 2018, Sinovac's gross profit accelerated to $154 million and $230 million, respectively, which represents an astonishing gross margin of nearly 90% in both years.

24. Sinovac's revenue is derived entirely from the sale of vaccines. The commercial success of a single vaccine may powerfully influence Sinovac's revenues. Indeed, in 2018, over 70% of Sinovac's revenues were derived from a single vaccine, Inlive enterovirus 71.

**Sinovac's Development of a Revolutionary Polio Vaccine**

25. Sinovac has obtained regulatory approval in China to develop, conduct clinical trials, and produce the Sabin Inactivated Polio Vaccine ("sIPV").

26. Polio vaccines come in two types: "attenuated" and "inactive." The attenuated vaccine (which is mainly used in the developing world and is commonly known as the "Sabin" vaccine) contains a live "attenuated" or weakened virus. The "inactive" vaccine (used widely in the developed world), and commonly known as the "Salk" vaccine) contains a dead virus.

27. In rare cases, infants who receive "attenuated" vaccines contract polio. In order to eliminate this risk, the World Health Organization has adopted a strategic polio eradication plan to replace "attenuated" polio vaccine with "inactive" polio vaccine in immunizing programs globally by 2020.

28. Given that the "inactive" vaccine has traditionally been more expensive than the "attenuated" vaccine, the development of a less expensive "inactive" vaccine has assumed critical importance.

29. The market for cheaper "inactive" versions of the vaccine is enormous. Over 130 million babies are born each year in the world, including approximately 17 million in China.

Indeed, the global polio vaccine market is projected to grow from approximately $1.25 billion in 2018 to $2.15 billion in 2028.

30. Sinovac moved aggressively to exploit this market opportunity

31. In 2014, Sinovac entered into a license agreement with a government institute working under the Dutch Ministry of Public Health, Welfare and Sports to develop and commercialize sIPV for distribution in China and other countries. In November 2015, Sinovac obtained a clinical trial license for sIPV from Chinese regulators. The Phase I and II clinical trials were completed in April 2017.

32. In January 2018, the Phase III trial was successfully completed. The preliminary results of the trial which were available to Yin and Sinovac in April 2018, demonstrated that Sinovac's sIPV was superior to the control vaccine, clearing the path for Sinovac to commercialize an enormous market opportunity.

33. However, as further described below, Sinovac and Yin concealed the news of the Phase III results.

**The Yin Group Schemes to Buy Sinovac on the Cheap**

34. Beginning in 2016, Yin has colluded with Sinovac's directors and certain investors in his control group in a series of attempts to acquire Sinovac at below market value. Yin has served as Sinovac's CEO, chairman, president, and a director since 2003. Yin dominates and controls Sinovac and its board.

35. On January 30, 2016, Yin and SAIF Partners IV L.P. (the "Yin Group") jointly submitted a bid to acquire all shares of Sinovac for $6.18 in cash per share in a purported "going private" transaction. At the time of this bid, the Yin Group owned approximately 29.5% of the Company's issued and outstanding shares, with SAIF Partners IV L.P. owning 18.9%, and Yin

owning 10.6% of Sinovac's common stock, respectively. Yin and SAIF Partners IV L.P. filed Schedule 13D forms with the SEC confirming that they were acting together as a part of a "group."

36. The Yin Group's offer of $6.18 per share dramatically undervalued Sinovac.

37. On February 3, 2016, a competing bid was submitted by the group (the "Sinobioway Consortium") led be Sinobioway Group Co., Ltd., a publicly traded Chinese company affiliated with Peking University that owns 27% of Sinovac's operating company, Sinovac Beijing.

38. The Sinobioway Consortium offered to acquire all of Sinovac's shares for $7.00 in cash.

39. Yin rejected this superior offer.

40. On March 28, 2017, in a transparent attempt to prevent Sinovac shareholders from offering competing bids to the Yin Group, Sinovac's board of directors (at Yin's request) adopted a Rights Agreement. The Rights Agreement contained a "poison pill" provision providing that, if stockholders holding at least 15% of Sinovac stock entered into an agreement or understanding to act together for purposes of voting their shares, Sinovac could massively dilute all such stockholders.

41. In a renewed attempt to consummate a going private transaction, on June 26, 2017, the Company announced that it had entered into an "Amalgamation Agreement." Under the terms of the agreement, the Yin Group (which owned 29.5% of Sinovac) would acquire the shares of all other stockholders for $7.00 per share. According to a Company press release announcing the deal, the, Group intended to fund the Amalgamation Agreement "through a combination of contributions form C-Bridge Capital, Advanced Capital and Vivo Capital or their respective affiliates."

42. On June 28, 2017, the Sinobioway Consortium submitted a revised proposal of $8.00 per share to acquire the Company, a 14.9% premium over the consideration offered by the Yin Group.

43. Yin reject this superior offer.

**The Yin Group Conceals the Breakthrough Results of Sinovac's Phase III Study**

44. Beginning in April 2018, Yin and Sinovac suppressed news of Sinovac's breakthrough on its Polio vaccine.

45. Sinovac's clinical trials for sIPV included three phases. The most important phase was Phase III, in which Sinovac's new vaccine would be compared to a control vaccine.

46. The Phase III trial was completed in January 2018.

47. On April 19, 2018, Sinovac made only a vague and cryptic disclosure regarding what they called "preliminary results" from the Phase III study:

> The preliminary results of the trial after unblinding show the seroconversion rate of polio virus type II is superior to the control vaccine and seroconversion rates of the other two types of poliovirus are non-inferior to the control vaccine.

48. The above statement did not disclose any quantitative data concerning the critical "seroconversion rate," the rate at which antibody to polio develop in the body, which is the ultimate test of any polio vaccine. While the disclosure indicated that the seroconversion rate of Sinovac's new vaccine was "superior" to the control vaccine for polio type II and "non-inferior" to the control vaccine for other types of polio, investors and analysts were left to guess what these terms meant.

49. In April 2018, Sinovac and Yin plainly had access to the actual data underlying the preliminary results of the Phase III study. There would have been no basis for Sinovac to disclose in April 2018 that the seroconversion rate of its vaccine was *"superior"* or *"inferior"* to that of the control vaccine, unless Sinovac had a basis in the data to make such a comparison.

50.     Without any disclosure of the actual seroconversion data (which is universally provided by publicly traded vaccine companies in their disclosures concerning Phase III trials), it was impossible for investors to assess the actual performance of Sinovac's vaccine and appreciate that a breakthrough had been achieved.

51.     On November 8, 2018, approximately ten months after the Phase III study was completed, the Company disclosed in a 6K filing that the "preliminary results of the Phase III study "showed that it was not inferior to the control vaccine group." Once again, Sinovac failed to disclose any data underlying the preliminary results.

52.     Indeed, it was not until April 16, 2019, *one year after the preliminary results of the Phase III trial became available to Sinovac*, that the Company finally disclosed data underlying those results. The data revealed that the seroconversion rate of Sinovac's polio vaccine was superior to the control vaccine for all three types of polio and that Sinovac's polio vaccine was as effective as the inactive polio vaccine that is widely used in the developed world:

> ***This research implies that the studied sIPV is as effective as IPV in preventing poliovirus infection in infants aged 60-90 days, can be a reliable alternative to conventional IPV*** and can be a good supplement to OPV in potentially preventing or minimizing VDPV emergence or VAPP. Participants in the sIPV arm of the trial developed neutralizing antibodies against poliovirus types 1, 2 and 3 with seroconversion rates of 98% against type 1, 94.8% against type 2 and 98.9% against type 3. Seroconversion rates were higher in the sIPV arm than in the IPV arm against all these types, significantly so against types 1 and 2. Participants in the IPV are developed neutralizing antibodies against poliovirus types 1, 2 and 3 with seroconversion rates of 94.1% against type 1, 84.0% against type 2, and 97.7 % against type 3.

53.     This breakthrough was of enormous importance to the market. Although the impact of this breakthrough on Sinovac's stock price could not be immediately determined in April 2019 (because trading in Sinovac's stock has been suspended since February 2019, due to significant

litigation), the revelation that Sinovac had successfully developed a new polio vaccine with a multi-billion-dollar global market is obviously highly material to shareholders.

54. Sinovac, at Yin's direction, deliberately suppressed this breakthrough.

55. The revelation that Sinovac had successfully developed a new polio vaccine with a multi-billion-dollar market was highly material to investors and analysts, but Sinovac and Yin suppressed this information for a year – denying investors the benefit of this positive news on the Company's share price. Notably, the April 2019 announcement was made only after trading was suspended in the Company's stock in February 2019. Trading in the Company's stock remains suspended as of the date of this Complaint.

**Yin Orchestrates the Dilutive PIPE Transaction**

56. On July 3, 2018, Sinovac terminated the Amalgamation Agreement.

57. On the very same day, Sinovac announced that it issued 11,800,000 shares of Company stock in a private transaction to two members of Yin's buyer group: Vivo Capital LLC ("VIVO") and Advantech Capital LLC ("Advantech") at $7.35 per share.

58. The $7.35 price dramatically undervalued Sinovac. The price was not only below Sinovac's closing price of $7.79 on July 3, 2018, but also below Sinobioway's standing $8.00 per share bid, and far below its recent high of $8.66 on June 8, 2018.

59. The price of $7.35 per share also substantially undervalued Sinovac because Yin was concealing from the market (and materially omitting from Sinovac's SEC filings) the extraordinary results of the Phase III trial for Sinovac's polio vaccine. As discussed above, the Dilutive PIPE Transaction was announced in July 2018, approximately six months after the Phase III trial was completed. No data concerning the results of the Phase III study was disclosed at the time of the transaction.

60. The evidence indicates that Sinovac and Yin revealed the explosive results of the Phase III trial to Vivo and Advantech, while concealing these results from the market. Indeed, Sinovac's July 3, 2018 press release announcing the Dilutive PIPE Transaction brazenly reveals that the very proceeds from the Dilutive PIPE Transaction were allocated to "*build production facilities to support the development and commercialization of sIPV-based combination vaccine products*," *i.e.*, to exploit the breakthrough in Sinovac's polio vaccine which Yin was concealing from the market. Thus, in the Dilutive PIPE Transaction, Yin traded 11,800,000 Sinovac shares to his buyer group on the cheap, using highly material nonpublic information about the Phase III trial in breach of his fiduciary duties.

61. Further, and significantly, the Dilutive PIPE Transaction was plainly not done at arm's length with a third party. To the contrary, Vivo and Advantech were members of Yin's buyer group which (through the proposed Amalgamation Agreement discussed above) had improperly sought to take Sinovac private at a below-market price.

62. Indeed, there is a taint of collusion involving Vivo Capital, Advantech Capital and Yin that is evident from the fact that, as part of the Dilutive PIPE Transaction, dated July 2, 2018, they agreed to vote their shares affirmatively in favor of all the director designees nominated to serve on the Board of Directors, *i.e.*, in favor if designees nominated by Yin.

63. As a result of Yin's egregious misconduct, the Dilutive PIPE Transaction improperly siphoned economic value and voting power from public shareholders (including Plaintiff) to a control group of stockholders led by Yin.

64. Indeed, as shown in the table below, the transaction enabled Yin and his control group to amass a dominant position of approximately 40% of Sinovac's common stock, while massively diluting other shareholders.

| Shareholder | Before PIPE | After PIPE |
|---|---|---|
| Yin | 10.56% | 8.94% |
| SAIF | 18.82% | 15.16% |
| Prime Success LP[1] | N/A | 8.29% |
| Vivo Capital | N/A | 8.29% |
| All other Shareholders | 71.11% | 59.31% |

65.     By breaching his fiduciary duties and massively diluting Sinovac's shareholders, illegally achieved his objective of seizing the Company at a fire-sale price.

*__Continuing Efforts the Squeeze out Minority Shareholder__*

66.     Since this litigation was filed, there has been a steady and persistent attempt by the Defendants to siphon the value of Sinovac Life Sciences Co., Ltd. ("Sinovac LS") from the minority shareholders (including Plaintiff) to the Defendants' allies. Once a wholly-owned subsidiary of the Company, Sinovac LS is the crown jewel of Sinovac. It is where the value of the Company's COVID-19 vaccine, CoronaVac, resides.

67.     Since May 2020 there have been a number of unusual transactions involving new investors in Sinovac LS at a vast range of valuations that benefits Yin and his allies, who are acquiring stakes in the extremely valuable subsidiary and diluting Sinovac shareholders. These transactions have occurred despite Sinovac's stock remaining suspended from NASDAQ trading and despite the still undetermined legitimacy of Sinovac's board, which is a matter still in litigation in Antigua. Under the circumstances, these unusual transactions have put the Plaintiff at an extreme disadvantage in protecting its investment in Sinovac and the value of Sinovac. In addition, Sinovac's incumbent board's track record of attempts to wrest control of the company from

---

[1] According to the Schedule 13G filed with the SEC on July 10, 2019 by Prime Success, Advantech Capital Partners Ltd. is the sole shareholder of Green Vision Partners Limited, and Green Vison Partners Limited is the general manager of Prime Success, LP.

shareholders in the U.S. at artificially low valuations has cast its shadow on this and other transactions involving the extremely valuable Sinovac LS.

68.     On May 22, 2020, two investors in the dilutive PIPE transaction (which is already an issue in this litigation) converted their $15 million loan to Sinovac into a stake in Sinovac LS between 6.3% and 7.5% each. Such a combined stake in the "crown jewel" of Sinovac's Covid-19 vaccine development suggests there is a potential play to take the valuable subsidiary private. The valuation of Sinovac LS per this transaction was only an estimated $100 million (15% stake for $15 million convertible loan).

69.     On November 24, 2020, a sale and purchase agreement ("SPA") was entered into by an arm of the Chinese private equity firm CDH Investments (CDH Utopia Limited or "CDH") and 1Globe Biomedical (Hong Kong) Company Limited ("1Globe"), an affiliate of 1Globe Capital LLC – the Defendant and Counterclaimant in *Sinovac Biotech Ltd., v. 1Globe Capital LLC*, No. 1:18-cv-10421-NMG (D. Mass.).  Pursuant to the SPA, 1Globe will sell 6 million shares of Sinovac common stock to CDH at $15.00 per share. 1Globe and CDH are each seeking a board seat, or two in total, at Sinovac. 1Globe and related parties, like CDH, now claim a stake of 32.3% of Sinovac - based on the outstanding stock. Notably, CDH Investments has been active in takeovers and as an investor in privatizations of U.S.-listed Chinese companies domiciled in the Cayman Islands. This investment by CDH values Sinovac at approximately $1.5 billion versus Sinovac's current frozen market cap of $460 million.[2]

70.     Only a fortnight later, on December 7, 2020, Sinovac announced that Sinovac LS had secured approximately $500 million in funding for further development of its COVID-19 vaccine, as well as to conduct other development and operational activities. The investor, Sino

---

[2] Based on post-poison pill outstanding shares of 98.9 million.

Biopharmaceutical Limited ("Sino Biopharm"), is a leading innovative research and development conglomerate in China and has invested these funds in exchange for approximately 15% of the total equity interest in the subsidiary Sinovac LS.  This investment values the Sinovac LS subsidiary alone at approximately **$3.3 billion.**  Sinovac LS's valuation is more than 2X the value of its parent based on a transaction just two weeks prior, and more than 7X its parent's current frozen market cap of $460 million. Sinovac LS's valuation increases and attracts investors friendly to Sinovac, while U.S. shareholders of Sinovac are seeing the value of its crown jewel distributed to allies of the Defendants as they suffer from the frozen shares and value of Sinovac.

71. Should such a private transaction occur involving the further transfer of Sinovac LS or its value beyond the parent Sinovac, while the legitimacy of its board is still in litigation and Sinovac's stock is suspended, the parties' position in this action could be materially impacted.

**The December 2020 "Truce" Suggests That Defendants are Using the Pending Litigation for Tactical Advantage**

72. It should also be noted that in December 2020, per public reports, "1GlobeCap, as the principal shareholder of Sinovac, call[ed] on all Sinovac stakeholders to put aside their differences and work together to support Sinovac's COVID-19 vaccine, which is a front-runner among global COVID-vaccine programs."[3]

73. Meanwhile, the questionable investments in Sinovac LS by Defendants' allies at the expense of minority shareholders continues, despite the apparent "peace" which has not been

---

[3] "I Globe Capital, he Largest Shareholder of Sinovac Biotech, reached Agreement with SEC and Calls on All Stakeholders to Support Sinovac's COVID-19 Vaccine Program," NASDAQ (December 23, 2020), found at *https://www.nasdaq.com/press-release/[1Globe Capital, the Largest Shareholder of Sinovac Biotech, Reached Agreement with SEC and Calls on All Stakeholders to Support Sinovac's COVID-19 Vaccine Program | Nasdaq](#)*

extended to the courts in Massachusetts, Antigua, or Delaware, suggesting that the pending litigation in these jurisdictions is merely a ploy to keep Sinovac's share price frozen in time, while the majority shareholders continue to siphon off the Company's value.

### COUNT I

#### Direct Claim for Breach of Fiduciary Duty
#### (Against Yin)

74. Plaintiff repeats and re-alleges each allegation set forth herein.

75. Yin owed fiduciary duties to plaintiff as a de facto controlling shareholder and was required to act in the best interests of the minority shareholders and not to engage in self-dealing or otherwise exert control to seek an advantage for himself to the detriment of minority stockholders.

76. Plaintiff was a minority stockholder of the Company at all relevant times herein.

77. Yin breached his fiduciary duties by improperly exercising control and causing Sinovac to enter into the Dilutive Pipe Transaction that benefitted himself and entities in his control group.

78. Yin orchestrated the self-dealing Dilutive Pipe Transaction after failing in his attempts to take the Company private in 2017. These transactions involved the same entities in Yin's control group. Yin's consistent objective has been to seize control of Sinovac while preventing any competing bids.

79. In orchestrating the Dilutive Pipe Transaction, Yin breached his fiduciary duties by engaging in a transaction that: (1) issued an excessive amount of Sinovac stock to the Pipe investors at a price well below fair market value, and that was based upon the suppression of inside information regarding a breakthrough that Sinovac had achieved in developing its revolutionary polio vaccine; (2) disproportionately benefited the Yin Group at the expense of minority

shareholders; and (3) improperly transferred economic value and voting power from public shareholders (including Plaintiff) to controlling stockholders.

80. Plaintiff has been damaged by Yin's misconduct in an amount to be determined at trial.

## COUNT II
### Aiding and Abetting Breaches of Fiduciary Duty
### (Against Yin)

81. Plaintiff repeats and re-alleges each allegation set forth herein.

82. Sinovac knowingly aided and abetted Yin's breaches of fiduciary duty alleged herein.

83. Plaintiff has been damaged by Sinovac's conduct in an amount to be determined at trial.

## COUNT III
### Direct Claim for Wrongful Equity Dilution
### (Against All Defendants)

84. Plaintiff repeats and re-alleges each allegation set forth herein.

85. At all relevant times, Yin exercised domination and control over the business and affairs of Sinovac.

86. Acting at the direction of Yin, in the Dilutive PIPE Transaction, Sinovac issued shares to the PIPE investors at a price well below their actual value. As a result of the Dilutive PIPE Transaction, the Yin Group and the PIPE Investors increased their ownership of Sinovac, while the interests of Plaintiff were wrongfully diluted.

87. The Dilutive PIPE Transaction is an improper transfer of economic value and voting power from public shareholders (including Plaintiff") to controlling shareholders led by Yin.

88. Plaintiff has been damaged by the Dilutive PIPE Transaction in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Awarding damages to Plaintiff and the Class for losses sustained as a result of the Dilutive PIPE Transaction;

B. Awarding Plaintiff the costs of this action, including attorneys' and experts' fees;

C. Prejudgment interest;

D. Awarding equitable relief in the form of disgorgement of the wrongful proceeds derived by Defendants by virtue of their conduct described herein;

E. Granting such other and further relief as this Court deems just and proper.


Dated: April ___, 2020               Respectfully submitted,


                                                       /s/ *Stephen Ryan, Jr.*
                                                       Stephen Ryan, Jr., Esq. (BBO #669727)
                                                       Mark Delaney, Esq. (BBO #652194)
                                                       **RYAN LITIGATION AND ADVOCACY PLLC**
                                                       1167 Massachusetts Ave.
                                                       Arlington, MA 02476
                                                       Tel.:  617-762-5788
                                                       sryan@ryan-litigation.com


                                                       ***Attorney for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on April___, 2021, a true and correct copy of the foregoing document was served electronically through the ECF system on all counsel of record.

                                                       */s/ Stephen Ryan, Jr.*
                                                      Stephen Ryan, Jr.